**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

STEPHEN M. D'EREDITA,

                              Plaintiff,

            -vs-                                 DECISION AND ORDER

ITT CORPORATION[1],                                      11-CV-6575-CJS-MWP

                              Defendant.

**APPEARANCES**

| | |
|---|---|
| For Plaintiff: | Ryan Charles Woodworth, Esq.<br>The Woodworth Law Firm<br>16 West Main Street Suite 732<br>Rochester, NY 14614<br>(585) 310-2563 |
| For Defendant: | Joseph S. Brown, Esq.<br>Hodgson Russ, LLP<br>The Guaranty Building<br>140 Pearl Street Suite 100<br>Buffalo, NY 14202<br>(716) 848-1346 |

**INTRODUCTION**

**Siragusa, J.** Before the Court is defendant ITT Water Technology, Inc.'s ("ITT") motion for summary judgment on Plaintiff's claims of disability discrimination and retaliation under both the Americans with Disabilities Act ("ADA") and New York State Human Rights Law ("NYSHRL") (N.Y. Exec. Law § 290 *et seq.*).[2] For the following reasons, ITT's application is granted.

---

[1] ITT Corporation is incorrectly identified as the defendant. ITT Water Technology, Inc. (now known as Xylem Water Systems U.S.A., LLC) is the correct name for the defendant.

[2] Defendant filed its initial motion for summary judgment, ECF No. 21, on August 7, 2013, then filed an amended notice of motion on April 2, 2014, ECF No. 30. This Decision and Order addresses both.

## BACKGROUND

Plaintiff Stephen M. D'Eredita ("D'Eredita") filed a complaint on November 21, 2011, ECF No. 1, following summary judgment against him on an earlier lawsuit which alleged similar violations. *D'Eredita v. ITT Indus.*, No. 07-CV-6185-CJS, 2009 WL 1161618, at *1 (W.D.N.Y. Apr. 29, 2009), *aff'd sub nom. D'Eredita v. ITT Corp.*, 370 F. App'x 139 (2d Cir. 2010); *see also* Brown Decl. ¶¶ 5-7, Aug. 7, 2013, ECF No. 21-1 (setting out the procedural background of the prior lawsuit). In that previous suit, D'Eredita alleged that his employer, ITT, discriminated against him on the basis of disability for failing to provide a reasonable accommodation and failing to engage in the interactive process. *Id.* ¶ 8. He also asserted a claim for retaliation. *Id.* That action centered on D'Eredita's employment as a Commercial Assembler from 2002 through 2004. *Id.* ¶ 9. In granting summary judgment for ITT, the Court held: (1) D'Eredita could not perform his job as a Commercial Assembler without an accommodation; (2) ITT engaged in the interactive process required under the ADA, and that ITT's proposed accommodation, layoff with the option to bid on a non-assembly job, was reasonable; (3) the accommodations requested by D'Eredita were not reasonable; and (4) D'Eredita's retaliation claims were meritless. *D'Eredita v. ITT Indus.*, No. 07-CV-6185-CJS, 2009 WL 1161618, at *11–13.

The relevant facts in D'Eredita's present lawsuit are very similar to those of his previous action. D'Eredita began his career with ITT, formerly Gould Pumps, in 1987. *DeRue Decl.* ¶ 7, Aug. 7, 2013, ECF No. 21-3. In 2002, he was "bumped," per the Labor Agreement, to the position of Commercial Assembler at the Commercial Factory in Auburn, New York. *Id.* ¶ 8. D'Eredita struggled with the fast pace of the Commercial Factory and committed numerous fabrication errors that led to an extensive disciplinary rec-

ord. *Id.* ¶ 9. Despite ample evidence to terminate his employment, ITT placed him on layoff status in February 2004. *Id.* ¶ 11. The relevant portions of the written Suspension Agreement included these terms: (1) D'Eredita was placed in a layoff status, but permitted to bid on non-production and non-shipping positions for a year; (2) ITT continued to pay the employer portion of D'Eredita's health insurance premium; and (3) after presenting ITT with a doctor's letter stating that he probably had mild dyslexia, ITT arranged and paid for D'Eredita to visit a clinical psychologist for further testing. *Id.* ¶¶ 10-11. If unsuccessful in the bidding process, ITT would terminate his employment. DeRue Decl. Ex. 1, Suspension Hearing Agreement, Aug. 7, 2003, ECF No. 21-4.

The bidding process at ITT is governed by a Labor Agreement between it and the United Steelworkers Local Union, No. 3928. *Id.* ¶ 15. It requires any vacant position at ITT to be put up for a bid. DeRue Decl. Ex. 2, § 7.9 Job Bidding. The position is awarded to the most qualified employee.[3] Seniority is a tiebreaker only when two applicants have substantially equal qualifications. *Id.* ITT had limited discretionary authority to transfer employees. DeRue Reply Decl. Ex. A, §4.8B of Labor Agreement, Nov. 7, 2014, ECF No. 39-1. Employees can only be transferred to vacant positions for 30 days. *Id.* On February 28, 2005, D'Eredita's employment continued after he successfully bid on a non-production job in the Tool Crib. DeRue Decl. ¶ 13. Though displaced from this position years later, he successfully bid on a Commercial Assembler position (Level 6) in December of 2008. *Id.* ¶ 14.

---

[3] "Level 1, 2 and 3 jobs and jobs listed in the Appendix will be awarded to the senior applicant. Level 4 and 5 jobs, if there are no bidders who have previously held the job and no lower level exists to repost, then the award will be made to the senior applicant." DeRue Decl. Ex. 2, § 7.9 Job Bidding.

After being job failed from the Commercial Assembler position, D'Eredita successfully bumped into a Utility Assembler position (Level 4). *Id.* ¶ 24. The job description written by ITT requires all Utility Assemblers to "read simple drawings, use scale, gauges and similar measuring instruments." Spingler Decl. ¶ 11, Aug. 7, 2013, ECF No. 21-5. All Utility Assemblers must also be capable of following standard procedures "in pump assembly to expedite and correct assembly." *Id.* ¶ 10. According to Richard Spingler, Production Manager for ITT, this requirement is based on ITT's expectation that all Utility Assemblers be trained on all aspect of the assembly process to ensure that ITT can meet customer demands at any given time. *Id.* ¶ 12.[4] Each line in the SES[5] Factory consisted of a team of one to three assemblers. *Id.* ¶ 20. D'Eredita typically worked on the "85 line." *Id.* ¶ 22. To maintain projected profit margins for the pumps built on this line, Utility Assemblers must produce a minimum of five units per hour. *Id.* ¶ 23.

While working as a Utility Assembler, D'Eredita performed below average and committed frequent production errors. A few months into the job, his productivity was in the 80% range when it was expected to be 100%. *Id.* ¶ 36. Moreover, on May 28, 2009, D'Eredita built four defective units. *Id.* ¶¶ 39, 46. To improve performance, D'Eredita requested two accommodations: (1) to be placed on a line with other Utility Assemblers, and (2) to color code the motors. *Id.* ¶¶ 56, 59. ITT refused to grant the requests. *Id.* ¶ 55.

---

[4] In his response to ITT's Statement of Facts, D'Eredita disputes this allegation, stating that it "calls for response as to the state of mind of ITT and/or ITT management." Since this response does not dispute the fact alleged by Spingler, the Court accepts it as true for the purposes of this analysis.

[5] Sump Effluent Sewage Factory. *Id.* ¶ 3.

On October 20, 2009, after months of ineffective performance, ITT provided D'Eredita with a Suspension Memo nearly identical to the one he received in 2004. DeRue Decl. ¶ 37. The written memo detailed that: (1) D'Eredita is to be put on layoff without pay; (2) while on layoff, D'Eredita must be the successful bidder on a non-production, non-shipping position within one year, or else be terminated; (3) D'Eredita will not have any future bumping rights; and (4) ITT will pay up to one year of D'Eredita's medical premiums. DeRue Decl., Ex.7.

While on layoff, D'Eredita failed to successfully bid on a non-production or non-shipping position. From October 21, 2009 to October 21, 2010, D'Eredita bid on three positions: job 1088, job 1135, and job 1142. DeRue Decl. Ex. 8. Further, D'Eredita claims that he could have worked in various other jobs: Tow Truck Driver; Carousel attendant in the paint line; Inspector Position; Maintenance Position; Delivery Position in the Commercial Factory; and Assistant Position in the EPD.[6] D'Eredita Reply Decl. ¶¶ 19-22, Nov. 7, 2014, ECF No. 39-1. Because D'Eredita failed to successfully bid on a non-production, or non-shipping position, ITT terminated his employment. *See* DeRue Decl. ¶ 51. D'Eredita contends that his layoff on October 21, 2009, characterized as a suspension pending termination, was ITT's attempt to terminate him for engaging in a protected activity.

D'Eredita filed charges with the U.S. Equal Employment Opportunity Commission ("EEOC") in February of 2004, and again on December 2, 2010. DeRue Decl. ¶ 12; Brown Decl. ¶ 30. On August 19, 2011, EEOC determined that it could not conclude

---

[6] Engineered Products Division, *Id.* ¶ 21.

whether a violation occurred; it granted D'Eredita a right to sue letter. Brown Decl. ¶ 31. His complaint in this Court alleges two causes of action against ITT. One is for a violation of his rights under the ADA by, "refusing to provide Plaintiff with [sic] retaliating against him engaging in protected activity under the ADA, and terminating his employment as a result of his disability and/or perceived disability." The other uses the same language to allege a violation of the New York State Human Rights Law, New York Executive Law § 290 *et seq.*

ITT filed a Notice of Motion on August 7, 2013, ECF No. 21, and filed an amended Notice of Motion on April 2, 2014, ECF No. 30. The only differences between the two notices are the location of the court (the first using the Buffalo address for the Western District of New York, the second its Rochester address), and the dates for response, as set by the Court between the filing of the two notices.

## STANDARD OF LAW

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d

98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert. denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *See Anderson*, 477 U.S. at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1)(B). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Moreover, in the context of employment discrimination, a plaintiff has the ultimate burden of proving the elements of the claim by a preponderance of the evidence. The showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is *de minimis. Chambers v. TRM Copy Centers*, 43 F.3d 29, 37 (2d Cir. 1994).

## **ANALYSIS**

### *Timeliness of Plaintiff's EEOC Charge*

The Court must determine whether D'Eredita's November 18, 2010 EEOC charge was timely filed. This charge, which was date-stamped and received by the EEOC on December 2, 2010, alleged discriminatory discharge and retaliation for engaging in a protected activity. Brown Decl. ¶ 31. In order to be timely, ITT's decision to terminate must have occurred between January 24, 2010, and November 18, 2010. Thus, the central issue with respect to this inquiry is the date of termination, or in other words, the date which commenced the limitation period. D'Eredita claims October 20, 2010, the date of discharge. ITT contends October 20, 2009, the date of discharge notification.

In resolving this impasse, the Court looks to the ADA. This statute requires a charge of discrimination be filed with the EEOC no later than 300 days after the occurrence of an allegedly unlawful employment practice. 42 U.S.C § 2000e-5(e)(1) (2006). The unlawful employment practice in discriminatory discharge cases is often the decision to terminate the employee. *Flaherty v. Metromail Corp.*, 235 F.3d 133, 137 (2d Cir. 2000).

The 300-day limitation period commences when the employee receives definite notice about the decision to terminate. *Id.* An employee receives definite notice when an employer's official position—or its intent to terminate—is communicated to him, which will not always coincide with the actual discharge. *See Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) ("When Ricks was denied tenure, he was given a 1-year 'terminal' contract. Thus, in each case, the operative decision was made—and notice given—in advance of a designated date on which employment terminated."); *Delaware State College v. Ricks*,

449 U.S. 250, 262 (1980) ("[t]he proper focus is upon the time of the discriminatory acts, not upon the time that the consequences of the acts become most painful"); *Miller v. Internat'l Tel. & Tel. Corp.*, 755 F.2d 20, 23 (2d Cir. 1985) (ADEA case: "The 300-day period, in the case of a discriminatory discharge, starts running on the date when the employee receives a definite notice of the termination, not upon his discharge."); *Felder v. Pepsi Cola*, No. 14-CV-4315 NGG, 2015 WL 3447216, at *4 (E.D.N.Y. May 6, 2015) ("In the event of a discriminatory discharge, the 300-day period commences when the alleged discriminatory decision is made and communicated to the plaintiff, which may or may not coincide with the date that employment ended."); *Meyers v. I.B.M. Corp.*, 335 F. Supp. 2d 405, 410 (S.D.N.Y. 2004) ("Thus, where the employee is terminated, the employee receives definite notice when it is communicated to him that he will be terminated, not upon his discharge."). The date of employee's discharge is a fact; it is not itself an illegal act. *See Chardon*, 454 U.S. at 8. "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Ricks*, 449 U.S. at 257.

An employer often communicates its official position, or its intention to terminate, through a written document prior to the employee's last day on the job. *See Felder*, 2015 WL 3447216, at *4. The notice presented to an employee must unambiguously convey the employer's intent and the exact date of termination. *See id.* at *5. Though definite notice is often conveyed in writing, oral communication can suffice. *Compare Miller*, 755 F.2d at 23–24 (holding Plaintiff received definite notice on August 28, 1978 'that he would, absent exceptional circumstances, be removed from the payroll on April 1, 1979), *with Felder*, 2015 WL 3447216, *6 (holding Plaintiff did not receive definite no-

tice because Defendant's communication contained unspecified content and an unspecified termination date).

The above stated principles compel the Court to find D'Eredita's EEOC charge was untimely filed. The 300 day limitation period commenced October 21, 2009, upon D'Eredita's receipt of definite notice regarding his impending termination. DeRue Decl. ¶ 37. At a suspension hearing, ITT presented D'Eredita with a written memo detailing its official position prior to his last day on the job. The memo unambiguously conveyed ITT's intention to terminate him on October 21, 2010, if he was unable to find a non-production and non-shipping job during the one year layoff period. As a result, all of D'Eredita's ADA claims are time barred.

## New York State Humans Rights Law

### Disability Discrimination

Though D'Eredita's federal claims are dismissed, the Court will exercise its supplemental jurisdiction in the interests of judicial economy. The Second Circuit upholds the exercise of a court's discretionary authority in situations where the "state law claims are analytically identical to federal claims. *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 118 (2d Cir. 2013); *Benn v. City of New York*, 482 F.App'x 637, 639 (2d Cir. 2012); *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 n. 11 (2d Cir. 2004). Since NYSHRL claims are analytically identical to the ADA,[7] the Court now considers D'Eredita's state-based discrimination and retaliation claims.

---

[7] *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170 1177 (2d Cir. 1996) ("We consider [plaintiff's] state law claims in tandem with her Title VII claims because New York Courts rely on federal law when determining claims under the New York [State] Human Rights Law").

The Second Circuit applies the federal ADA burden-shifting standard to New York Human Rights Law claims of disability discrimination. *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 99-100 (2d Cir. 2006). This framework, etched out by the Supreme Court in *McDonnell Douglas Corp.,* requires: (1) a plaintiff to establish a prima facie case of discrimination, after which (2) the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question. *See id.*; *see also McDonnell Douglas Corp., v. Green*, 411 U.S. 792 (1973). Once employer provides such a reason, it is entitled to summary judgment unless (3) plaintiff can present "sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext" for discrimination. *See Ferraro*, 440 F.3d at 100.

As an initial matter, a plaintiff's claim will be dismissed unless he can establish a prima facie case of discrimination. This burden is met only if the plaintiff can show: (a) the employer is subject to the ADA; (b) he suffers from a disability as defined in the ADA; (c) he could perform the essential functions of her job with or without reasonable accommodation; and (d) he suffered an adverse employment action due to the disability. *Thompson v. New York City Dep't of Prob.*, 348 F. App'x 643, 645 (2d Cir. 2009).

Once a plaintiff establishes the first two prongs of his prima facie case, he must then demonstrate, pursuant to the above mentioned standard, that he could perform the essential functions of his job with *or* without reasonable accommodations. *Id.* As such, a defendant seeking summary judgment must first demonstrate that absent reasonable accommodations, the plaintiff could not perform the essential functions of his job; and second, that the plaintiff could not perform the essential functions of his job even if provided with reasonable accommodations. On this latter point, a defendant can argue that

the plaintiff's suggested accommodations were unreasonable regardless of whether he could have performed the essential functions of the job with them. *See D'Eredita v. ITT Indus.*, No. 07-CV-6185-CJS, 2009 WL 1161618, at *12 (W.D.N.Y. April 29, 2009).

When analyzing the controlling terms of this element, namely essential functions and reasonable accommodations, it becomes evident the ADA is relatively silent about what constitutes a job's essential functions. *See McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 98 (2d Cir. 2009). In light of this, the Second Circuit relies upon regulations promulgated by the EEOC, the agency entrusted with the responsibility of enforcing the ADA. *See McBride*, 583 F.3d at 98. Essential functions encompass the fundamental job duties of the employment position. 29 C.F.R. § 1630.2(n)(1). Considerable deference is given to an employer's judgment and written descriptions of what the job entails. 29 C.F.R. § 1630.2(n)(3); *D'Eredita v. ITT Corp.*, 370 F. App'x 139, 140 (2d Cir. 2010); *D'Amico v. City of New York*, 132 F.3d 245, 151 (2d Cir 1998).

Though seemingly silent with respect to the essential functions prong, the ADA states, rather explicitly, that an employer need only provide accommodations that are reasonable. *See* 42 U.S.C.A § 12112(b)(5)(A) (2009); *see also* 42 U.S.C. § 12111(9)(A)-(B) (detailing the most common examples of reasonable accommodations). The Second Circuit has made clear that "a reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. New York City Transit Authority*, 332 F.3d 95, 100 (2d Cir. 2003); *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991). Nor can it require an employer to lower production standards. *Fink v. New York City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) (construing the Vocational Rehabilitation Act of 1973's reasonable accommodation provision).

A reasonableness inquiry is required to better equate the interests of employer and employee; absolute accommodation would subject employers to undue burdens. *See generally* 42 U.S.C. § 12111(10) (defining undue hardship). Thus, to fulfill this goal, the ADA expressly states that an employer need not provide accommodations that impose undue hardships on the business. 42 U.S.C. § 12112(b)(5)(A) . When evaluating undue hardship, factors to be considered include the accommodation's expense and whether it would be excessively burdensome to provide. 42 U.S.C. § 12111 (10).

Among the examples of reasonable accommodations provided under the ADA, it is true that reassignment to a vacant position is included in the non-exhaustive list. 42 U.S.C. § 12112(b)(5)(A). "[A] plaintiff seeking to hold the employer liable for failing to transfer her to a vacant position as a reasonable accommodation must demonstrate that there was a vacant position into which she might have been transferred." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 567 (2d Cir. 2000). Establishing the actual existence of the vacancy is required; the burden is not satisfied by merely stating that he could have been reassigned to this position or that position. *See McBride*, 585 F.3d at 97.

In the instant case, ITT concedes that D'Eredita could establish the first two elements of his prima facie case of disability discrimination. However, despite this concession, there is disagreement as to the third element: whether D'Eredita could perform the essential functions of a Utility Assembler with or without accommodation. On this basis, the Court holds the following as a matter of law. First, D'Eredita could not perform the essential functions of a Utility Assembler without an accommodation. Second, providing D'Eredita's suggested accommodations would be unreasonable even if the suggested

accommodations would allow him to perform the essential functions of a Utility Assembler. Finally, there existed no non-production or non-shipping vacancy at the time D'Eredita sought transfer.

D'Eredita argument indicates that he could not perform the essential functions of a Utility Assembler, the position he occupied immediately before termination, without accommodations. *See* Pl.'s Mem. of Law at 8–9, Oct. 17, 2014, ECF No. 37. It is undisputed that the Utility Assembler job description, which was written by ITT and approved by D'Eredita's union, outlines the position's essential functions as speed and accuracy. It states that a Utility Assembler must follow standard assembly procedures to deliver products in an *expeditious* and *accurate* manner. Spingler Decl., Ex A (noting an assembler on D'Eredita's line is required to produce a minimum of five pumps to meet the desired profit margin). This requirement demands that Utility Assemblers be "[a]ble to read simple drawings; use scales, gauges and similar measuring instruments." *Id.*

Moreover, in Production Manager Spingler's judgment—one he gained over the course of a decade as manager at the SES Factory—an ability to work independently is also an essential function of a Utility Assembler. Depending on customer demand, Utility Assemblers must be capable of working alone or in small groups. Springer Decl. ¶¶ 1, 3. If demand is relatively sparse for one shift, it makes fiscal sense for ITT to schedule only one Utility Assembler at that time. In this sense, all Utility Assemblers must be able to quickly read and process material.

D'Eredita's work performance proves that he was unable to work with speed and accuracy absent any accommodations. A month into his job, his productivity was below expected levels. Spingler Decl. ¶ 36. Evidently D'Eredita sped up his performance and

began building faulty units. *Id.* ¶¶ 36–38. On May 28, 2009, he built four defective pumps at significant cost to ITT. *See id.* ¶¶ 39, 45, 46. Given that ITT has demonstrated that accuracy with speed is an essential function of a Utility Assembler, it is clear, as a matter of law, D'Eredita could not perform his job without accommodations.

The two accommodations requested by D'Eredita are unreasonable, as they would unduly burden ITT, even if they would allow him to perform the essential functions of Utility Assembler. D'Eredita first requested that additional employees be added to his line. He then requested the addition of color coordinated motors.

This Court finds that the first suggested accommodation would obviate the flexibility that ITT considers an essential function for Utility Assemblers. D'Eredita must be capable of working alone. Scheduling additional workers to D'Eredita's line would require ITT to assume superfluous labor expense. It would require two or more employees to build a unit that could be built by one. This, in turn, would reduce employee productivity and would interfere with ITT's desired profit margins. In accommodating a disabled employee, the law does not require this.

The second suggested accommodation would also impose undue hardship on ITT. In years past, ITT attempted to color coordinate an aspect of its process. Spingler Decl. ¶ 59. ITT's previous attempt at color coordinating was in regards to a component. *Id.* ¶ 60. However, with regard to the various motors, ITT would have had to ask its supplier to implement the color changes, and the supplier would have to drastically revamp its setup at a significant cost to ITT. *Id.* Given that color coordinating an aspect of its process would have required significant costs, the Court now holds that requiring ITT to color coordinate 50 different types of complex motors of varying types and RPMs,

Spingler Decl. ¶ 62, would be unduly burdensome and expensive. In accommodating a disabled employee, the law does not require this.

Third, the record unequivocally proves that no suitable vacancy existed for D'Eredita to bid on between October 21, 2009 and October 21, 2010 at ITT's Auburn facility. D'Eredita claims that,

> ITT had a variety of additional non-production and non-shipping positions that I was able to perform the essential functions of, mainly due to my experience in working in these positions in the past. On a side note, these additional positions were consistently vacant and did not require "bidding" meaning they were assigned solely in ITT's discretion.

D'Eredita Decl. ¶ 21, Oct. 17, 2014, ECF No. 37-4. His contention, however, contradicts the terms of the labor agreement and the proof submitted by the HR Director, Dawn DeRue. For example, she states that the tow truck driver position was eliminated in the late 1990s and that "assemblers or material handlers are responsible for any driving required to complete the assembly process." DeRue Decl. ¶ 10. With regard to D'Eredita's contention he could have performed as a carousel attendant in the paint line, DeRue responds, "[n]o such position exists." *Id.* ¶ 11. Finally, D'Eredita's claim that he could have performed as an inspector fails to recognize the requirement that he have experience as a machinist. *Id.* ¶ 12.

The only way D'Eredita could have bid on vacancies at ITT is through its job-bidding process. DeRue Decl., Ex. 2, § 7.9 of Labor Agreement. This process is governed by the Labor Agreement between ITT and United Steelworkers Local Union, No. 3929, which requires any vacant position be put up for a bid. *See* Ex. 2, § 7.9. The position is awarded to the most qualified employee. Seniority is a tiebreaker only when two applicants have substantially equal qualifications.

The Labor Agreement also grants ITT limited discretionary authority to transfer employees. DeRue Reply Decl. Ex. A, §4.8B of Labor Agreement. Employees can only be transferred to *vacant* positions for 30 days. Since the Labor Agreement explicitly grants ITT authority to transfer only to vacant positions, the Agreement precludes ITT from assigning employees to positions that are not vacant, D'Eredita has failed to show that a discretionary transfer to another position was reasonable.

Though D'Eredita bid on three jobs while on layoff, ITT awarded the positions, pursuant to the Labor Agreement, to more qualified employees. From October 21, 2009, to October 21, 2010, D'Eredita bid on three positions: job 1088, job 1135, and job 1142. DeRue Decl., Ex. 8. Jobs 1088 and 1135, level 6 and level 7, respectively, were awarded to applicants with greater qualifications and seniority. *Id.*, Ex. 9. ITT withdrew Job 1142, a level 6 position, because it reinstated the previously fired job holder following a grievance process. *See* DeRue Reply Decl. ¶ 18.

Moreover, outside of the jobs he bid on, D'Eredita cannot point to a single non-production or non-shipping vacancy between October 21, 2009, and October 21, 2010, while simultaneously complying with the Labor Agreement. D'Eredita provides a litany of jobs that he could have performed: tow truck driver, Carousel Attendant in the paint line, inspector position, a maintenance position on the shipping floor and/or assembly floor, a delivery position in the commercial factor, or an assistant position in the EPD Factory. *See* D'Eredita Decl. ¶ 22, Oct. 17, 2014. Without further detailing the reasons why each of these examples is insufficient, the Court finds it sufficient to summarize the following: the record conclusively demonstrates that these positions did not exist, were not vacant

between October 21, 2009, and October 21, 2010, or required qualifications that D'Eredita did not possess at the time he sought transfer.

### *Retaliation*

The Court applies the same framework for analyzing ADA, and NYSHRL retaliation claims. *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir.2000); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir.1999). Accordingly, the federal burden shifting standard applies to NYSHRL claims of retaliation. *See Kwan v. Andalex Group* LLC, 737 F.3d 834, 843 (2d Cir. 2013); *Hicks*, 593 F.3d at 164 (2d Cir. 2010). To establish a prima facie case of retaliation, a plaintiff must show: (a) he engaged in a protected activity; (b) his employer was aware of that activity; (c) he suffered an adverse employment action; and (d) there was a causal connection between the protected activity and the adverse employment action. *Kwan*, 737 F.3d at 844. A plaintiff's burden of proof as to his prima facie case has been characterized as "*de minimis.*" *See Hicks*, 593 F.3d at 164. The Court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit an inference of retaliatory motive. *Id.*

Under the adverse employment prong, only actions that are materially adverse to a reasonable employee or job applicant suffice. *Id.* at 165. Actions are materially adverse if they are harmful to the point where they could dissuade a reasonable worker, or an individual of ordinary firmness, from making or supporting a charge of discrimination. *Id.* at 168. This standard is objective, though context matters. Id. An act that may be immaterial in some situations may be material in others. *Id.*

As set forth above, the Court's analysis begins with D'Eredita's *de minimis* burden to establish a prima facie case of unlawful retaliation. D'Eredita can satisfy the first two elements. He unquestionably engaged in protected activity when he filed: EEOC charges of disability discrimination in July of 2004, August of 2004; and a federal lawsuit in January 13, 2009. Given that ITT successfully defeated Plaintiff's allegations in Court, it is equally indisputable that ITT knew D'Eredita engaged in this protected activity.

However, D'Eredita cannot demonstrate any actions that ascend to the level of adverse employment actions. D'Eredita provides a myriad of acts that he believes do rise to that level: the suspension, the disciplinary letter, and the termination. Contrary to these contentions, the Court finds that ITT did not take any adverse actions against him. Following numerous production errors, ITT provided D'Eredita with a layoff package identical to the one this Court and the Second Circuit approved in the 2007 action. D'Eredita was unable to find alternate employment and was subsequently terminated. The reasonable employee in D'Eredita's position would not be dissuaded from making or supporting a charge of discrimination if he knew that, after making numerous errors, he would be given the opportunity to find a job at his current place of employment rather than being immediately terminated. Consequently, D'Eredita cannot meet even the minimal burden of showing ITT took any adverse actions against him in retaliation for engaging in a protected activity. Thus, he cannot establish a prima facie case of retaliation.

- 20 -

## CONCLUSION

For the above stated reasons, ITT's motion for summary judgment, ECF No. 21, as amended by ECF No. 30, is granted. D'Eredita's complaint is dismissed in its entirety. The Clerk is directed to enter judgment and close the case.

DATED:   November 5, 2015
           Rochester, New York

                                          <u>/s/ Charles J. Siragusa</u>
                                          CHARLES J. SIRAGUSA
                                          United States District Judge